**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| JEAN CLAUDE HAKUZIMANA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:24-cv-12672-JEK |
| IVORY SYSTEMS, INC. and BRISTOL MYERS SQUIBB, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS
AND IVORY SYSTEMS, INC.'S MOTION FOR JOINDER**

**KOBICK, J.**

This case arises out of an employment dispute between plaintiff Jean Claude Hakuzimana and defendants Ivory Systems, Inc. and Bristol Myers Squibb ("BMS"). From late May 2023 to late September 2023, Hakuzimana was assigned by Ivory to work for BMS as a quality assurance contractor. After his separation from both companies, Hakuzimana, proceeding *pro se*, brought this lawsuit alleging claims of discrimination, retaliation, breach of contract, promissory estoppel, and intentional infliction of emotional distress. Hakuzimana also claims that the defendants violated several wage and hour laws. BMS and Ivory each filed motions to dismiss, and Ivory separately filed a motion seeking to join in BMS's motion to dismiss. For the reasons that follow, those motions will be granted in part and denied in part. All of Hakuzimana's claims against Ivory except the promissory estoppel claim will be dismissed. Against BMS, Hakuzimana has stated plausible claims of discrimination, retaliation, and intentional infliction of emotional distress, but his remaining claims will be dismissed.

**BACKGROUND**

The following facts, which are assumed true on a motion to dismiss, are drawn from the complaint, documents fairly incorporated by reference in the complaint, and documents subject to judicial notice. *See Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 15 (1st Cir. 2024).

On May 12, 2023, Hakuzimana, an African American man of Rwandan origin, signed an employment contract with defendant Ivory Systems, Inc. ECF 12, ¶¶ 6, 22; ECF 12-5, at 1-2. The contract, which described Hakuzimana as a consultant and independent contractor, specified that he would be assigned by Ivory to work at defendant Bristol Myers Squibb, a biopharmaceutical company in Devens, Massachusetts. ECF 12-5, at 1-2. Hakuzimana started work for BMS as a Senior Quality Assurance contractor on May 29, 2023. ECF 12, ¶¶ 6-7, 22. He was responsible for reviewing whether BMS's production of commercial medications—from culture growth to harvesting, purification, and storage—comported with various regulations and industry guidelines. *Id.* ¶ 6. Throughout his time at BMS, Hakuzimana was supervised by BMS managers and adhered to BMS policies. *Id.* He reported directly to BMS Manager Venkata Dinavahi. *Id.* ¶ 7. Hakuzimana worked for BMS from May 29, 2023 until September 27, 2023. *Id.*; ECF 12-2, at 21-25.

Hakuzimana allegedly experienced several incidents of discriminatory treatment while he was at BMS. ECF 12, ¶ 7. On the first day of his orientation in May 2023, BMS Director David Keese and Manager Sam Codyer questioned whether Hakuzimana could handle the demanding work and close collaboration required for the job. *Id.* ¶¶ 7, 9; ECF 12-2, at 1. During the summer of 2023, Dinavahi offered various trainings to co-workers of Asian descent, but rebuffed Hakuzimana's requests for the same training. ECF 12, ¶ 7. At the end of the summer, on August 31, 2023, Hakuzimana notified his team at BMS that he would be naturalized as an American citizen that day and might arrive late to work. *Id.* After his naturalization ceremony, he logged onto

his BMS Teams chat to let his team know he would arrive by 4:00 p.m. and to apologize for his tardiness. *Id.* Keese's reply to the message, visible to the whole team, asked whether Hakuzimana had been arrested. *Id.*

During Hakuzimana's time at BMS, Dinavahi made derogatory comments about Africa, asking, for example, whether wild animals show up at houses there and criticizing the smell of African food. *Id.* ¶¶ 7, 9. Dinavahi also questioned Hakuzimana's education and ability to perform his job. *Id.* On one occasion, while Hakuzimana was in the process of scheduling an interview for a permanent position at BMS, Dinavahi made Hakuzimana "kneel begging with tears in his eyes to let him interview for a permanent position." *Id.* In early September 2023, Hakuzimana overheard a co-worker ask Dinavahi how he was "going to deal with JC," referring to Hakuzimana. *Id.* Dinavahi replied: "I will have to make him look like he does not belong in the BMS culture. I just have to keep pushing him and he'll break." *Id.*

On September 13, 2023, Hakuzimana reported these episodes of discriminatory conduct to Kathleen Nagle, his main contact at Ivory, via text message. *Id.* ¶ 8; *see* ECF 12-5, at 2. In a follow-up phone call, he explained to Nagle that while he enjoyed the work at BMS, the discrimination was taking a toll on his mental and emotional well-being. ECF 12, ¶ 8. After the call, Nagle asked Hakuzimana via text if he would stay at BMS if Ivory were able to secure him a pay raise, but not a new manager. *Id.* ¶ 9; ECF 12-2, at 13. Hakuzimana replied in the affirmative. ECF 12, ¶ 9; ECF 12-2, at 13. Nagle sent Hakuzimana a form to officially request a raise from BMS. ECF 12-2, at 14. Notwithstanding multiple requests from Nagle, Hakuzimana failed to fill out the form. *Id.* at 14-21. On September 19, Nagle told Hakuzimana via text that BMS was "aware of the situation" and that Ivory would "stay on top of" BMS, but Hakuzimana needed to send her the form in order to effectuate his request for a raise. *Id.* at 14.

Also during the month of September 2023, Hakuzimana applied for a permanent position at BMS and was initially scheduled to interview for the job on September 27. ECF 12, ¶ 10. That interview was twice rescheduled, once to September 22 at 1:30 p.m. and then a second time back to September 27 at 9:30 a.m. *Id.*; ECF 12-10, at 10-12. At 7:00 a.m. on the morning of September 27, Hakuzimana was notified via text that his interview had been cancelled. ECF 12, ¶ 10; ECF 12-10, at 14. The text message did not explain the cancellation. ECF 12-10, at 14.

Later that morning on September 27, Hakuzimana texted Nagle, "[p]lease inform BMS next week is my last week." ECF 12-2, at 21. In response, Nagle asked if there was anything Ivory could do, and informed him that, if not, she would tell BMS that Hakuzimana's last day would be on October 6. *Id.* Separately, at 11:09 a.m. on September 27, Hakuzimana wrote to the BMS Teams chat detailing his frustration with the interview cancellation and stating: "I have decided that I . . . will be moving on from BMS. I will be sending in my two weeks' notice through my employer." ECF 12, ¶ 10; ECF 12-9, at 1. Keese responded in the Teams chat, "Hey JC, sorry to hear that, I will look to get you a download on feedback asap." ECF 12, ¶ 10. When Hakuzimana began his shift at BMS later that day at 2:00 p.m., he felt that the work atmosphere was cold. *Id.* At 2:45 p.m., Hakuzimana asked Nagle to push up his last day to Friday, September 29. ECF 12-2, at 22. Nagle expressed regret about the situation and offered to intervene with BMS on Hakuzimana's behalf if he could send more information. *Id.* at 23. Hakuzimana told Nagle that he would send an email explaining what had happened, but he failed to send it. *Id.* at 22-24.

The next morning, on September 28, Nagle told Hakuzimana via text that BMS had decided to release him early because of his Teams message announcing that he was quitting. *Id.* at 24. Thus, his last day at BMS was September 27, and he did not report to work there on September 28. *Id.*

4

In her text message, Nagle stated that Hakuzimana would nevertheless be "paid up until 10/11 since [he] communicated to BMS that that was [his] last day." *Id.*; ECF 12, ¶ 10.

Later on September 28, Hakuzimana texted Nagle saying that he had not in fact resigned, but had instead been terminated from BMS while on sick leave. ECF 12, ¶¶ 11, 26; ECF 12-2, at 25-29. However, his text message exchanges with Nagle give no indication that Hakuzimana informed Nagle that he wished to take a sick day on September 28. ECF 12-2, at 21-29. In the weeks that followed, Hakuzimana continued to dispute his resignation with Amanda Mead, a human resources manager at BMS. ECF 12-4, at 1-2; ECF 12, ¶ 13. He questioned whether BMS would pay him through October 11, even though he stopped working on September 27. ECF 12, ¶ 13; ECF 12-4, at 2-3, 6. Mead explained that while Hakuzimana's contract "would not allow for a payment to be made for time not worked," BMS was willing to offer Hakuzimana a lump sum payment in exchange for a standard release of claims. ECF 12, ¶ 13; ECF 12-4, at 7, 12.

On July 22, 2024, Hakuzimana obtained a right to sue letter from the Equal Employment Opportunity Commission. ECF 12-1, at 2. He then initiated this action, *pro se*, in October 2024 and filed an amended complaint in April 2025. ECF 1, 12.[1] Against Ivory and BMS, the amended complaint asserts claims of (1) discrimination on the basis of race and national origin, in violation of Title VII, 42 U.S.C. § 2000e-2(a); (2) retaliation for complaining about discrimination, in violation of Title VII, 42 U.S.C. § 2000e-3(a); (3) a violation of 42 U.S.C. § 1981; (4) a violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*; (5) a violation of the Massachusetts Wage Act, M.G.L. c. 149, § 148; (6) a violation of the Massachusetts Earned Sick Time Law, M.G.L. c. 149, § 148C; (7) a violation of the Massachusetts Temporary Workers Right to Know Law,

---

[1] The defendants' request to dismiss the entire case pursuant to Federal Rule of Civil Procedure 41(b) due to Hakuzimana's confusion regarding the deadline for filing the amended complaint is not well taken.

M.G.L. c. 149, § 159C; and (8) intentional infliction of emotional distress. ECF 12, ¶¶ 22-54, 57-67. Against Ivory alone, the amended complaint also asserts claims for (9) breach of contract and (10) promissory estoppel. *Id.* ¶¶ 55-56.

BMS moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF 30. A month later, Ivory filed a motion for joinder with BMS's motion, as well as a separate motion to dismiss. ECF 45, 46. The Court held a hearing after receiving the opposition, reply, and sur-reply briefs and took the motions under advisement. To the extent the arguments made by BMS apply equally to Ivory—and not all do, as noted in the analysis below—Ivory's motion for joinder will be granted. Otherwise, it will be denied.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court "may properly consider only facts and documents that are part of or incorporated into the complaint." *Rivera v. Centro Médico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (quotation marks omitted). Where, as here, the plaintiff is proceeding *pro se*, the Court construes the complaint liberally. *See Vieira v. De Souza*, 22 F.4th 304, 311 (1st Cir. 2022).

## DISCUSSION

### I.    The Defendants' Employer Status.

The Court begins by addressing a threshold issue that cuts across many of Hakuzimana's claims: whether Ivory, BMS, or both entities were Hakuzimana's employer for purposes of his discrimination, retaliation, and wage and hour claims. Although Hakuzimana's contract with Ivory described him as an independent contractor, Ivory offers no substantive argument to refute Hakuzimana's contention that he was an employee, and it was his employer, for purposes of the statutes invoked in the amended complaint. *See generally* ECF 47, 55.[2] More specifically, Ivory does not dispute that under the test for misclassification set forth in M.G.L. c. 149, § 148B(a), Hakuzimana must be regarded as an employee rather than an independent contractor.[3] Hakuzimana's payroll records from Ivory identify him as an "employee," ECF 12-7, and when Hakuzimana asked Nagle by text, "who is my employer?" Nagle replied, "Ivory Systems but we follow BMS policies," ECF 12-2, at 9. Accordingly, for purposes of Hakuzimana's claims, he was an employee and Ivory was his employer.

BMS, in contrast, does dispute Hakuzimana's contention that it also should be regarded as his employer. In the employment context, a plaintiff may seek to hold an entity like BMS liable

---

[2] Ivory's motion for joinder states that Hakuzimana "alleges that Ivory and BMS are liable to him under a joint employer theory, which both Ivory and BMS dispute." ECF 45, ¶ 2; *see also* ECF 47, at 17 n.8. BMS makes a detailed argument as to why it was not Hakuzimana's employer, even though Ivory was his employer. *See* ECF 31, at 8-11. Ivory itself makes no independent argument disputing its employer status, nor does it dispute BMS's contention that Ivory was Hakuzimana's employer. Ivory's fleeting statement is not sufficient to preserve an argument that it was not Hakuzimana's employer, and that issue is deemed forfeited. *See Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 19 (1st Cir. 2009) ("[I]issues adverted to . . . in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned." (quotation marks omitted)).

[3] The amended complaint alleges that Hakuzimana was misclassified under M.G.L. c. 149, § 148B(a), providing Ivory ample notice of his contention that he should be regarded as an employee rather than an independent contractor. ECF 12, ¶¶ 57-62.

under a "joint employer" theory. *Burnett v. Ocean Props., Ltd.*, 987 F.3d 57, 65, 68 (1st Cir. 2021) (describing the distinction between joint employer and single integrated employer theories of liability). The basis of the joint employer theory is that one company, "while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees" who work for the independent company, such that both companies are considered employers. *Torres-Negrón v. Merck & Co., Inc.*, 488 F.3d 34, 40 n.6 (1st Cir. 2007) (quotation marks omitted). The inquiry turns on "whether there are sufficient indicia of an employer/employee relationship to justify imposing liability on the plaintiff's non-legal employer." *Engelhardt v. S.P. Richards Co., Inc.*, 472 F.3d 1, 4 n.2 (1st Cir. 2006).

To determine whether an entity is a joint employer under antidiscrimination, labor, and wage and hour laws, courts examine "whether the alleged employer (1) had the power to hire and fire the employe[e]; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998); *see Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico*, 929 F.2d 814, 819-20 (1st Cir. 1991) (looking to similar factors in age discrimination case); *Jinks v. Credico (USA) LLC*, 488 Mass. 691, 703 (2021) (adopting the same four factor analysis for Massachusetts wage and hour laws). Application of these factors is not a mechanical exercise, and "it is the totality of the circumstances that will determine whether an entity ought to be considered a joint employer." *Jinks*, 488 Mass. at 703-04. Importantly, a "finding that two companies are an employee's 'joint employers' only affects each employer's liability to the employee for their *own* actions, not for each other's actions." *Torres-Negrón*, 488 F.3d at 40 n.6.

Hakuzimana has plausibly alleged that BMS was also his employer under a joint employer theory. The first two factors "address the extent of a putative employer's control over the nature and structure of the working relationship." *Baystate Alternative Staffing*, 163 F.3d at 675. Hakuzimana's amended complaint and the incorporated documents suggest that BMS retained extensive control over his schedule and work conditions. Codyer, a BMS manager, hired Hakuzimana and ran his orientation. ECF 12, ¶ 7. Hakuzimana's direct supervisor, Dinavahi, was also a BMS manager. *Id.* BMS managers determined Hakuzimana's overall work schedule, including whether he had to work on site during state and federal holidays. *See* ECF 12-2, at 5, 11. When Hakuzimana sought to take a day off for his naturalization ceremony, it was BMS managers who told him he could not. ECF 12, ¶ 7. While at BMS, Hakuzimana was required to follow BMS's policies. *Id.* ¶ 6. Ivory, for its part, likewise had to adhere to BMS's policies regarding work schedules and supervisory control. ECF 12-2, at 10, 13-14. The first two factors clearly support regarding BMS as a joint employer.

The final two factors "address the extent of a putative employer's control over the economic aspects of the working relationship." *Baystate Alternative Staffing*, 163 F.3d at 676. These factors are more mixed. On the one hand, Ivory established Hakuzimana's rate and method of pay and issued his checks. *See* ECF 12-5, at 1 (contract between Ivory and Hakuzimana); ECF 12-7 at 1-7 (earning statements from Ivory). On the other hand, BMS's approval was required for Hakuzimana to get paid and to earn a pay raise. *See* ECF 12-2, at 3-4 (Nagle reminding Hakuzimana to get timesheets approved by BMS); *id.* at 14 (Ivory requiring approval from BMS leadership for a raise); *id.* at 17 (same). But weighing these factors alongside the first two, both of which cut in Hakuzimana's favor, the amended complaint easily clears the bar for plausibly alleging that BMS was Hakuzimana's joint employer along with Ivory.

II.    **Discrimination Claims.**

Hakuzimana asserts that Ivory and BMS discriminated against him based on his race and national origin, in violation of Title VII, 42 U.S.C. § 2000e-2(a), and 42 U.S.C. § 1981. He contends that he experienced discrete adverse employment actions—the cancellation of his interview and a constructive discharge—as a result of discrimination, and that he also experienced a hostile work environment. With regard to both theories of discrimination, the parties dispute whether the amended complaint contains enough factual specificity to survive dismissal.

A.    Discriminatory Treatment.

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 likewise forbids purposeful employment discrimination on the basis of race. *See id.* § 1981(c); *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996). Where direct evidence of discriminatory intent is not present, courts employ the familiar burden-shifting framework outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), to analyze both claims. *See Lima v. City of East Providence*, 17 F.4th 202, 207-08 (1st Cir. 2021). Under that framework, Hakuzimana first must allege the following elements of a prima facie case: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action at the hands of his employer; and (4) there is some evidence of a causal connection between his membership in a protected class and the adverse employment action. *Luceus v. Rhode Island*, 923 F.3d 255, 258 (1st Cir. 2019). While he "need not plead facts sufficient to establish a prima facie case" at the pleading stage, "the elements of a prima facie case

may be used as a prism to shed light upon the plausibility of the claim." *Rodríguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013).

Ivory and BMS do not contest that Hakuzimana, a Black man of Rwandan descent, is a member of a protected class and that he was qualified for his job. Instead, they dispute that he has plausibly alleged an adverse employment action that was causally related to his race or national origin. Hakuzimana argues that he was subject to at least two adverse employment actions: (1) the cancellation of his interview on September 27, 2023, less than three hours before it was scheduled to occur, and (2) an involuntary resignation based on a constructive discharge.

BMS and Ivory offer no meaningful argument that an unexplained interview cancellation, when an employee is seeking a promotion, is not an adverse employment action. On the facts alleged here, BMS's decision to cancel Hakuzimana's September 27 job interview, mere hours before it was set to begin, plausibly constitutes a disadvantageous change in the terms of his employment. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024) (a Title VII plaintiff must show that the employment action "brought about some 'disadvantageous' change in an employment term or condition," but need not show "that the harm incurred was 'significant'"); *Walsh v. HNTB Corp.*, No. 24-1499, 2026 WL 710036, at *6 (1st Cir. Mar. 13, 2026) (employer's action to "deprive an employee of potential advancement opportunities" can "serve as an adverse employment action"). This Court has previously explained that "cancelling a hiring process to avoid hiring or promoting a person of color can amount to an adverse employment action." *Pierce v. President and Fellows of Harvard College*, 994 F. Supp. 2d 157, 162 n.7 (D. Mass. 2014).

With respect to Hakuzimana's claimed involuntary resignation, "[t]he constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable

11

person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). Hakuzimana must plausibly allege "'that (1) 'a reasonable person in [his] position would have felt compelled to resign' and (2) '[he] actually resigned.'" *Vélez-Ramírez v. P.R. through Sec'y of Justice*, 827 F.3d 154, 158 (1st Cir. 2016) (quoting *Green*, 578 U.S. at 555). The text messages attached to the amended complaint indicate that Hakuzimana actually resigned from BMS and Ivory, as he communicated his resignation to both entities on September 27, 2023. Thus, the relevant inquiry is whether he adequately alleges, as an objective matter, that his working conditions had "'become so onerous, abusive, or unpleasant that a reasonable person in [his] position would have felt compelled to resign.'" *Walsh*, 2026 WL 710036, at *8 (quoting *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000)).

BMS and Ivory contend that the facts alleged establish that Hakuzimana voluntarily chose to resign. But viewed in the light most favorable to Hakuzimana, the factual allegations clear the plausibility threshold for constructive discharge. Hakuzimana alleges that, over his four-month employment, he experienced numerous instances of discrimination at BMS. Most egregious, Hakuzimana's direct supervisor, Dinavahi, made him kneel and beg to interview for a permanent position at BMS. ECF 12, ¶ 7. Another supervisor, Keese, publicly joked about whether Hakuzimana's tardiness in arriving to work was because he had been arrested, notwithstanding Keese's knowledge that Hakuzimana had his naturalization ceremony earlier that day. *Id.* Dinavahi also made derogatory comments about Africa, questioned Hakuzimana's education and ability to perform, and refused to train him while offering one-on-one trainings to Asian coworkers. *Id.* The same month Hakuzimana resigned, he overheard Dinavahi telling a coworker that he wanted to make it appear that Hakuzimana "does not belong in the BMS culture," and he "just ha[d] to keep

12

pushing [Hakuzimana], and he'll break." *Id.* Accepted as true, these allegations reflect treatment well beyond the "ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Stratton v. Bentley Univ.*, 113 F.4th 25, 40 (1st Cir. 2024) (quotation marks omitted). They reflect a pattern of mistreatment that would plausibly make a reasonable employee feel compelled to resign. And Dinavahi's overt race- and nationality-based comments, together with the troubling racial allusions reflected in the supervisors' demeaning treatment of Hakuzimana, demonstrate a plausible causal connection between Hakuzimana's race and national origin, on the one hand, and his interview cancellation and constructive discharge, on the other.

Hakuzimana has, accordingly, stated plausible claims of racial and national origin discrimination under Title VII and Section 1981. However, all of the alleged conduct leading up to the interview cancellation and constructive discharge involved BMS employees, not Ivory or its employees. And in a joint employer situation like this, as discussed, each employer may be held legally responsible only "for [its] *own* actions, not for each other's actions." *Torres-Negrón*, 488 F.3d at 40 n.6. Hakuzimana's disparate treatment claims must therefore be dismissed as to Ivory, even while they survive BMS's motion to dismiss.

      B.      <u>Hostile Work Environment.</u>

Hakuzimana also claims that he was subject to a hostile work environment because of his race and national origin, leading to his involuntary resignation. "A hostile work environment exists in violation of Title VII '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To sustain his hostile work environment claim, Hakuzimana must plead "offensive, race-based conduct that

is severe or pervasive enough to create an objectively hostile or abusive work environment and is subjectively perceived by [him] as abusive." *Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 613 (1st Cir. 2000). Courts looks to "all the circumstances, including the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with [the plaintiff's] work performance." *Kosereis*, 331 F.3d at 216.

Hakuzimana sufficiently alleges that BMS subjected him to a hostile work environment based on his race and national origin. This is so for the same reasons, and based on the same allegations, that his constructive discharge claims survive dismissal. The Supreme Court has recognized that "a hostile-work-environment claim is a 'lesser included component' of the '*graver* claim of hostile-environment constructive discharge.'" *Green*, 578 U.S. at 559 (quoting *Suders*, 542 U.S. at 149). In other words, to sustain a constructive discharge claim, a plaintiff must allege "harassment at least as severe (if not more) than that required for a hostile work environment claim." *Reyes v. Garland*, 26 F.4th 516, 522 (1st Cir. 2022) (quotation marks omitted). Hakuzimana's factual allegations, as explained, went well beyond simple teasing, offhand comments, and isolated incidents. *See Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 44 (1st Cir. 2011). Because Hakuzimana has plausibly alleged constructive discharge, he also states claims of a hostile work environment against BMS under Title VII and Section 1981. And because his factual allegations pertain solely to his work environment at BMS, not Ivory, his hostile work environment claim will be dismissed as to Ivory. *See Torres-Negrón*, 488 F.3d at 40 n.6.

### III.   Retaliation Claims.

Hakuzimana also claims that, in violation of Title VII and 42 U.S.C. § 1981, Ivory and BMS retaliated against him when he reported BMS's discriminatory conduct to Ivory. Title VII

14

makes it unlawful for an employer to retaliate against an employee for engaging in certain protected activity. *See* 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII or Section 1981, a plaintiff must plausibly allege that he (1) engaged in protected activity, (2) suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity. *See Pina v. Children's Place*, 740 F.3d 785, 800-01 (1st Cir. 2014); *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir. 2010). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Fantini v. Salem State College*, 557 F.3d 22, 32 (1st Cir. 2009) (quotation marks omitted). The plaintiff must ultimately establish that his or her protected activity was "a but-for cause of the alleged adverse action by the employer." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014). As with the substantive discrimination claims, the *McDonnell Douglas* framework applies to the retaliation claims. *Stratton*, 113 F.4th at 42.

Hakuzimana's theory is that, in retaliation for reporting BMS's discriminatory treatment of him, BMS and Ivory retaliated against him by cancelling his interview for a permanent position at BMS. The amended complaint plausibly alleges that Hakuzimana engaged in protected activity by reporting the discriminatory treatment he experienced at BMS to Nagle on September 13, 2023. ECF 12, ¶ 8. He told Nagle, among other things, that the discrimination was "taking a toll on his mental and emotional state." *Id.* That same day, Hakuzimana scheduled a virtual interview on September 27, 2023 with BMS managers, including Dinavahi, for a permanent position. ECF 12-10, at 7-9. Though the interview was rescheduled twice, it was set for September 27 at 9:30 a.m. *Id.* at 10, 12. Early that morning, BMS cancelled the interview without explanation. *Id.* at 14. These allegations plausibly establish that Hakuzimana suffered a "materially adverse" action—his

interview cancellation—that "could dissuade a reasonable employee from complaining of discrimination." *Stratton*, 113 F.4th at 42.

Hakuzimana also plausibly alleges that the interview cancellation was causally related to his protected conduct. Particularly at the pleading stage, "an inference of causation may be appropriate where there is close temporal proximity between protected activity and an adverse action." *Id.* at 45. Such an inference is not warranted, however, if there is no basis to believe that the decisionmaker was aware of the protected conduct. *See id.* While Ivory was aware of Hakuzimana's protected conduct—indeed, he made his report of discrimination to Nagle—BMS argues that it could not have retaliated against Hakuzimana for protected conduct because he reported its discriminatory behavior only to Ivory. The text messages attached to the amended complaint belie this contention. On September 19, 2023, about a week after Hakuzimana spoke with Nagle about the discriminatory conduct, Nagle wrote to Hakuzimana, "I have a form from BMS I need you to fill out . . . we will stay on top of BMS as well and they are aware of the situation." ECF 12-2, at 14. Viewed in the light most favorable to Hakuzimana, Nagle's message indicates that BMS knew of the discriminatory conduct Hakuzimana reported. Since his interview was cancelled two weeks after reporting that conduct, the temporal proximity between the protected activity and adverse employment action supports an inference of causation at this stage in the proceedings. *See DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) (finding satisfactory temporal proximity where "[a]ll of the events described here took place within a period of about one year"). Hakuzimana has met the "light" burden of establishing a prima facie case of retaliation against BMS. *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 117 (1st Cir. 2024).

Ivory separately argues that Hakuzimana failed to allege that *it* retaliated against him for reporting BMS's discriminatory conduct. This argument has force: Hakuzimana has not alleged

that Ivory was involved in BMS's decision to cancel his interview. To the contrary, Ivory supported Hakuzimana's request for a raise and continued to advocate for him after his report of discrimination. *See* ECF 12-2, at 13-14, 17-19. Because Hakuzimana has not plausibly alleged that Ivory, through its "own actions," caused his interview cancellation, Ivory's motion to dismiss the retaliation claims will be granted. *Torres-Negrón*, 488 F.3d at 40 n.6.

## IV.    Wage and Hour Law Claims.

Hakuzimana next asserts that Ivory and BMS violated the Massachusetts Wage Act, M.G.L. c. 149, § 148; the Massachusetts Earned Sick Time Law, M.G.L. c. 149, § 148C; the Massachusetts Temporary Workers Right to Know Law, M.G.L. c. 149, § 159C; and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* The Court addresses each claim in turn.

### A.    Massachusetts Wage and Hour Laws.

The Massachusetts Wage Act "imposes liability on employers who fail to pay wages earned by their employees." *Klauber v. VMware, Inc.*, 80 F.4th 1, 10 (1st Cir. 2023) (quotation marks omitted). The Legislature directed that "[e]very person having employees in his service shall pay . . . each such employee the wages earned by him." M.G.L. c. 149, § 148. While the statute does not define the term "earn," the Supreme Judicial Court ("SJC") has adopted the plain meaning of the term—i.e., "'[t]o acquire by labor, service, or performance,' or '[t]o do something that entitles one to a reward or result, whether it is received or not.'" *Awuah v. Coverall N. Am., Inc.*, 460 Mass. 484, 492 (2011) (quoting Black's Law Dictionary 584 (9th ed. 2009)). Thus, "[w]here an employee has completed the labor, service, or performance required of him," he has "'earned' his wage." *Id.*

Hakuzimana does not dispute that he was paid for the time he worked at BMS through September 27, 2023, *see* ECF 12-7, at 7, but he contends that the Wage Act entitles him to wages for the period from September 28 to October 11, 2023. Alternatively, he contends that even if he

did not earn wages for that period of time, the payments promised to him constitute severance owed to him under the Wage Act. The defendants seek dismissal of the claim on the basis that Hakuzimana did not work from September 28 to October 11, 2023, and therefore "earned" no wages under the Act.

The defendants have the better argument: Hakuzimana does not allege that he performed work for Ivory or BMS after September 27, 2023, and he therefore "earned" no wages beyond that date. Hakuzimana's effort to characterize Ivory's promise to pay him during that period as a form of "severance" does not aid him, because severance pay is not an "earned wage" under the Act. *Calixto v. Coughlin*, 481 Mass. 157, 162 n.9 (2018). Nor was BMS's alleged offer of a lump sum payment in exchange for a release of claims an "earned" wage under the Act. Ultimately, where it is undisputed that Hakuzimana was paid all wages earned by him for the hours he actually worked, he has failed to state a claim under the Wage Act. *See id.* at 161 ("The extraordinary relief the Wage Act provides . . . is directed at . . . not paying wages for work actually performed, and not at other employment violations.").

Hakuzimana also claims that Ivory and BMS violated the Wage Act and Earned Sick Time Law by failing to pay him accrued but unused sick time after his separation from Ivory and BMS. Neither claim is viable. The SJC has held that accrued and unused sick time is not a wage under the Wage Act. *Tze-Kit Mui v. Mass. Port Auth.*, 478 Mass. 710, 713 (2018). And the Earned Sick Time Law provides that "[e]mployers shall not be required to pay out unused earned sick time upon the separation of the employee from the employer." M.G.L. c. 149, § 148C(d)(7). The plain terms of the statute thereby foreclose Hakuzimana's claim, and the defendants are entitled to dismissal of his claims insofar as they allege violations relating to accrued sick time.

18

Finally, Hakuzimana claims that Ivory and BMS violated the Massachusetts Temporary Workers Right to Know Law, M.G.L. c. 149, § 159C, by failing to provide required notices. But the amended complaint contains no factual allegations elaborating on what required notices were withheld. Absent any factual support, Hakuzimana's conclusory assertion of a statutory violation is not sufficient to state a claim. *See García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). The Temporary Workers Right to Know Law claim will likewise be dismissed.

B.      Fair Labor Standards Act.

Hakuzimana also asserts that Ivory and BMS violated the FLSA by failing to pay all wages allegedly owed to him—namely, wages for the period from September 28 to October 11, 2023. Ivory and BMS contend that Hakuzimana's FLSA claim fails as a matter of law because the statute does not require payment for time spent not working. The FLSA establishes "a minimum wage and overtime compensation for each hour *worked* in excess of 40 hours in each workweek." *Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 31 (2014) (emphasis added); *see* 29 U.S.C. §§ 206, 207. It does not guarantee such compensation when the employee does not perform work. *See Montoya v. CRST Expedited, Inc.*, 88 F.4th 309, 320 (1st Cir. 2023) ("the FLSA guarantee[s] compensation for all hours worked" (quotation marks omitted)). Hakuzimana does not allege that Ivory and BMS failed to compensate him for overtime work performed between September 28 and October 11, nor does he allege that he worked during that period and was not paid the minimum wage. Accordingly, as with the Wage Act claim, Hakuzimana fails to state a claim that the defendants violated the FLSA by not paying for the period between September 28 and October 11, 2023. The FLSA claim will be dismissed.

V.     **Breach of Contract and Promissory Estoppel Claims.**

Against only Ivory, Hakuzimana asserts claims of breach of contract and promissory estoppel. He contends that Ivory breached its employment contract with him or, alternatively, failed to honor its unambiguous promise to pay him from September 28 to October 11, 2023. That promise was communicated when Nagle texted Hakuzimana on September 28 that he would be "paid up until 10/11." ECF 12, ¶¶ 10, 55; ECF 12-2, at 24.

"To show a breach of contract, 'the plaintiff must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach.'" *Klauber*, 80 F.4th at 14 (quoting *Minturn v. Monrad*, 64 F.4th 9, 14 (1st Cir. 2023)). The employment contract between Ivory and Hakuzimana states that Hakuzimana "is not eligible for and will not be paid for non-work days such as holidays, vacation, sick and personal days." ECF 12-5, ¶ 2. Hakuzimana does not allege that he performed work for BMS or Ivory after September 27. Accordingly, under the terms of the contract, Hakuzimana was not entitled to payment from Ivory in connection with the days he did not work between September 28 and October 11, 2023. Nor could Nagle's September 28 text be understood to have formed a new contract with Hakuzimana, where the amended complaint contains no allegations that any such contract was supported by valid consideration or imposed obligations on Hakuzimana. *See Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004) ("A contract must have consideration to be enforceable and [i]n order for a contract to have valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor.") (quotation marks omitted)); *Hogan v. Teamsters Loc. 170*, 495 F. Supp. 3d 52, 58 (D. Mass. 2020) (to survive a motion to dismiss a breach of contract claim, the "plaintiff must at least plead facts identifying who did what to whom, when, where, and why,

20

and explaining what obligations were imposed on each of the parties by the alleged contract" (quotation marks omitted)). The breach of contract claim will therefore be dismissed.

Even if there was no breach of contract, Hakuzimana argues, he relied on Ivory's promise to pay him until October 11 to his detriment. To state a claim for promissory estoppel under Massachusetts law, "a plaintiff must allege that (1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." *MacKenzie v. Flagstar Bank, FSB*, 738 F.3d 486, 496 (1st Cir. 2013) (quotation marks omitted). In Ivory's view, the amended complaint does not specify how its failure to honor its promise to pay Hakuzimana was detrimental to him and what actions he took in reliance on the statement. The Court disagrees. Hakuzimana alleges that he needed to know whether he was getting paid because he had to send information regarding his pay to the "federal government, state agencies like unemployment," and others who might have offered him help or legal assistance. ECF 12, ¶ 13. He separately alleges that his family was "put in a horrible financial situation" because he was unable "to inform agencies" whether he would be paid during that two-week period. *Id.* At this stage in the litigation, these allegations plausibly establish that Hakuzimana relied on Ivory's promise to pay him through October 11, 2023, and that reliance harmed him because he was unable to access unemployment or other benefits during that period. Accordingly, Ivory's motion to dismiss the promissory estoppel claim will be denied.

## VI.   <u>Intentional Infliction of Emotional Distress Claim.</u>

Finally, Hakuzimana asserts that Ivory and BMS intentionally inflicted emotional distress on him through their discriminatory conduct, failure to pay him, and coercive conduct. To make out a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must plausibly allege

21

"(1) that the actor intended to inflict emotional distress or that [he] knew or should have known that emotional distress was the likely result of [his] conduct . . . ; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community . . . ; (3) that the actions of the defendant were the cause of the plaintiff's distress . . . ; and (4) that the emotional distress sustained by the plaintiff was severe." *Butcher v. Univ. of Mass.*, 483 Mass. 742, 758 (2019) (quotation marks omitted). "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal." *Polay v. McMahon*, 468 Mass. 379, 385 (2014) (quotation marks omitted). And again, in this joint employment context, Ivory and BMS may be held responsible only "for their *own* actions, not for each other's actions." *Torres-Negrón*, 488 F.3d at 40 n.6.

Ivory and BMS contend that the alleged conduct underlying Hakuzimana's IIED claim—namely, discrimination, failure to pay wages, and an attempt to coerce him into releasing his claims by offering a settlement—does not rise to the level of outrageous conduct. The Court agrees in part. Ivory's alleged failure to pay two weeks of promised wages for time not worked and BMS's alleged attempt to "coerce" Hakuzimana by offering him a settlement do not plausibly constitute extreme and outrageous conduct under Massachusetts law. Conduct is extreme and outrageous "only if it goes beyond all possible bounds of decency, and is regarded as atrocious, and utterly intolerable in a civilized community." *Polay*, 468 Mass. at 386 (citation modified). Such conduct may require more than "tortious or even criminal" intent. *Id.* at 385-88 (quotation marks omitted) (filing false police reports, verbal insults, and video surveillance was not extreme and outrageous conduct); *see also Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 465-67 (1997) (wife and law firm's good-faith actions preventing testator's wishes from being carried out were not

extreme and outrageous). BMS's alleged settlement offer and the conduct underlying the promissory estoppel claim against Ivory do not plausibly meet this standard.

The allegations of discriminatory conduct by BMS stand on a different footing. The conduct underlying Hakuzimana's discrimination claims—including, among other things, one manager's requirement that Hakuzimana kneel and beg for an interview for a promotion; that same manager's statement that he would "have to keep pushing" Hakuzimana so that "he'll break";  and another manager's joke that Hakuzimana had been arrested on the day of his naturalization ceremony, ECF 12, ¶ 7—is the sort of behavior that is "utterly intolerable in a civilized community." *Butcher*, 483 Mass. at 758. These allegations involve the type of extreme and outrageous conduct that can give rise to an IIED claim. Hakuzimana also alleges that the discriminatory conduct exacerbated his post-traumatic stress disorder, depression, and anxiety, and caused him to relapse into alcohol use. ECF 12, ¶¶ 66-67. Hakuzimana has, accordingly, plausibly alleged an IIED claim against BMS, but not against Ivory.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, Bristol Myers Squibb's motion to dismiss, ECF 30, is GRANTED in part and DENIED in part. The motion is DENIED as to Hakuzimana's claims of discrimination, hostile work environment, and retaliation under Title VII and 42 U.S.C. § 1981, and as to his claim of intentional infliction of emotional distress. It is otherwise GRANTED.

Ivory Systems, Inc.'s motion for joinder, ECF 45, is GRANTED in part and DENIED in part. Its motion to dismiss, ECF 46, is also GRANTED in part and DENIED in part. The motion is DENIED as to Hakuzimana's claim for promissory estoppel. It is otherwise GRANTED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: March 31, 2026                    UNITED STATES DISTRICT JUDGE

23